## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID E. SIDELINGER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civ. No. 02-62 Erie** |
| | ) |
| **HARBOR CREEK SCHOOL** | ) |
| **DISTRICT,** | ) |
| | ) |
| **Defendant.** | ) |

### Opinion

Cohill, D.J.

Plaintiff David E. Sidelinger filed this civil rights employment action against Defendant Harbor Creek School District claiming that it violated his rights by failing to accommodate his religious beliefs and terminating his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 *et seq*.

A bench trial was held on March 20, 2006. Plaintiff was represented by Paul J. Susko, Esquire. Defendant was represented by Mark J. Kuhar, Esquire. At trial, testimony was provided by Plaintiff David Sidelinger, and David A. Smith, the superintendent of Harbor Creek School District. At the conclusion of Plaintiff's evidence the Court granted Defendant's motion for judgment as a matter of law in favor of Defendant. We now issue the following opinion explaining the basis for the ruling.

## I. Factual Findings

Plaintiff, David A. Sidelinger, was a chemistry teacher at Harbor Creek High School during 2000. He had been employed by the Harbor Creek School District as a teacher since 1980.

Beginning in March 2000, the Harbor Creek School District instituted a program requiring all Harbor Creek High School teachers to display a photo identification badge at school as part of its "Identification Project." Prior to the start of the program Mr. Sidelinger was instructed to see the art teacher, who explained that he was going to take Mr. Sidelinger's photograph to be used for a photo identification badge. Mr. Sidelinger refused to have his picture taken, explaining to the art teacher that he "didn't do that." (Tr. of Proceedings, March 20, 2006, at 10.)

Upon hearing of Mr. Sidelinger's refusal to have his photograph taken, David A. Smith, the Superintendent of Harbor Creek School District had a letter hand delivered to Mr. Sidelinger during school hours on Friday, March 3, 2000, stating, in part, as follows:

> The purpose of this letter is to direct you to meet with Mr. Zenewicz, Dr. O'Neil and me period 2 in my office on Monday, March 6, 2000. As an option, we are open to period 2 today, March 3, 2000. The purpose of this meeting is to discuss your stated refusal to be photographed for an employee ID badge, implied refusal to wear such a badge and our response. You will be asked to provide any reason that may have caused you to take such a position.

(Pl. Ex. 2, Letter from Smith to Sidelinger, March 3, 2000.)

In response to this letter, Mr. Sidelinger composed a letter consisting of his substantive response, which he delivered to the administrative office on the morning of March 6, 2000. (Tr. at 12 & 13.) The substantive response letter was accompanied by a cover letter to Dr. Smith, which explained that Mr. Sidelinger was seeking the "strictest form of

2

confidentiality" with regard to the enclosed sealed substantive response letter. (Tr. at 13-14, & Pl. Ex. 4, Letter from Sidelinger to Smith, March 6, 2000.) In his substantive response Mr. Sidelinger wrote:

> To whom it may concern,
>
> The actions of the Harbor Creek School District in reference to the wearing of photo ID tags is not acceptable due to very deep personal moral and religious convictions that do not permit such actions.
>
> David Sidelinger

(Pl. Ex. 3, Letter from Sidelinger to "To whom it may concern," March 6, 2000.)

At the request of Mr. Sidelinger, Dr. Smith met with him during period 2 on Monday March 6, 2000. (Tr. at 14, 148.) Only Mr. Sidelinger and Dr. Smith were present at the meeting. (Tr. at 14.) In an attempt to understand the basis for Mr. Sidelinger's objection Dr. Smith asked Mr. Sidelinger to explain what his beliefs and convictions were and how they related to wearing the identification badge. (Tr. at 147, 149.) Mr. Sidelinger explained to Dr. Smith that his deep moral and religious convictions extend back to his teenage years, and that he did not want to take part in any kind of adornment. (Tr. at 15.) Mr. Sidelinger explained that by "teenage years," he specifically meant when he was a Boy Scout and Eagle Scout. (Tr. at 15.) He had earned awards that resulted in various organizations offering to pin badges and buttons on him and "elevate [him] to a God-like status." (Tr. at 15-17.) He further explained that although he did initially wear the adornments at some point after he attained the rank of Eagle Scout he ceased to wear any badges and thereafter removed himself

3

from having anything to do with self-adornment. (Tr. at 16.) Mr. Sidelinger then suggested to

Dr. Smith that instead of wearing the Badge he could carry it in his wallet. (Tr. at 18.)

Mr. Sidelinger brought a tape recorder with him to the next meeting he had with Dr.

Smith on March 10, 2000. (Tr. at 21.) Mr. Sidelinger explained that he wanted to record the

meeting for his legal protection since he did not have a representative at the meeting. (Pl. Ex.

5, Transcript of tape recording of March 10, 2000 meeting.) Dr. Smith explained that the

purpose of the meeting was not to have a discussion but just to give him a warning, which he

did as follows:

> David, I need you to think about wearing that badge over the weekend, they are
> making one for you, if you don't wear it Monday, I am going to send you home
> without pay Tuesday, Wednesday and Thursday. (C[harging] P[arty] Mumble) As I
> have indicated it is not a discussion, but I want to be up front with you and I don't
> want to surprise you and say on Monday, hey your [sic] going home, I want you to
> know what is coming, I want you to have a weekend to think about it, weekend to get
> a representative, if you want to discuss it on Monday, I'm glad, I will be glad to do
> that, but that's where I am, and I want you to know that up front.

(Pl. Ex. 5.)

After the meeting Mr. Sidelinger picked up his temporary identification badge and

placed it in his wallet. (Tr. at 25.) The temporary ID Badge had Mr. Sidelinger's name

printed on the face, the badge was laminated, and had a safety pin on the back, but it did not

have a photograph. (Pl. Ex. 6, David Sidelinger's Harbor Creek High School Temporary ID

Badge.)

On Sunday March 12, 2000, Mr. Sidelinger typed a responsive letter, which he

delivered to the school board president, Cindy Himes, in person that same day. (Tr. at 26, 29-

30.) He also delivered a copy of the letter to a fellow teacher, Richard May, so that Mr. May

could deliver the letter to Dr. Smith on Monday. (Tr. at 28, 30.) Mr. Sidelinger's March 12,

4

2000 letter was addressed to the Harbor Creek School Board and noted "Attn: President to be

shared with all Board members." (Pl. Ex. 8, Letter from Sidelinger to School Board, March

12, 2000.) The letter stated:

> BACKGROUND:
> - On Friday March 3, 2000 your superintendent Dr. David Smith delivered the attached letter.
> - On Monday March 6, 2000 I complied with the letter dated March 3, 2000 with a written response which is also attached. In addition a small conversation between Dr. Smith and myself ensured. During the conversation I suggested to Dr. Smith that the simple solution, that would not be moral[ly] or religiously offensive to myself, was placing an identification card in my wallet similar to the student body.
> - On Friday March 10, 2000 Dr. Smith again met with myself to confirm that my moral and religious beliefs would not be tolerated. At that time he asked me to consider changing my moral and religious convictions over the weekend. In addition he issued a verbal warning/threat "that if I did not change my moral and religious convictions that I would receive a three day suspension beginning on Monday March 13, 2000".
> - On Friday March 10, 2000 the office issued an identification card to myself. I placed it in my wallet.
>
> These actions so precipitate the following:
>
> The actions of Dr. Smith demonstrate religious persecution. If the Board is in agreement with Dr. Smith I will not be able to return to work within the District under such a "cloud of persecution". I will not indulge in sins of pride. I will not indulge in sins of hypocrisy.
>
> If the Board recognizes that moral and religious differences exist within the community and some common ground must be reached to accommodate those differences then I would view Dr. Smith's actions as a misunderstanding.
>
> To insure classroom coverage, I have phoned in a sick day(s).

(Pl. Ex. 8.)

After delivering the letters, Mr. Sidelinger telephoned the school district's answering

system and stated that he would not be in attendance at school on Monday due to mental

distress. (Tr. at 29, 30, 84, 86.) Mr. Sidelinger did not come to school on Tuesday also, and

5

he did not notify the school district of his absence in advance.  (Tr. at 32-33.)  Consequently, Dr. Smith wrote a letter to Mr. Sidelinger memorializing that Mr. Sidelinger had called in an absence on Sunday evening, but that he did not indicate in that call the date of absence, nor did he indicate that he would have multiple absences.  (Pl. Ex. 9, Letter from Smith to Sidelinger, March 14, 2000.)  Thus, a substitute teacher was obtained for Monday, but not for Tuesday, and the students in Mr. Sidelinger's class were left unsupervised for a period of time in the morning.  (Pl. Ex. 9.)

Dr. Smith also notified Mr. Sidelinger that this conduct was unsatisfactory and that the district required a medical excuse to substantiate his claim of mental distress.  (Pl. Ex. 9.)  Mr. Sidelinger explained that having to call in every day was a change in school policy.  (Tr. at 33-35.)  In addition, because he was refusing to wear the badge and Dr. Smith said he would be sent home if he refused to wear the badge, it made no sense to Mr. Sidelinger that the school district actually expected that he show up only to be sent home.  (Tr. at 31, 35, 37.)

Next, Mr. Sidelinger and the Principal of the High School, Edward Zenewicz, had a telephone conversation about Mr. Sidelinger not being in school due to not wearing the ID badge.  (Tr. at 35-36.)  Mr. Zenewicz followed up the telephone conversation with an email to Mr. Sidelinger on March 20, 2000, which stated in part as follows:

> I have talked with Dr. Smith regarding your concerns and the misunders[]tandin[g].  Please note that the information that you have written and Dr. Smith's reply are already in your file. . . .
> . . .
> 2.  You need to articulate your position in the "misunderstanding" in the proper manner and not avoid conversation by not being present.

(Pl. Ex. 10, Email from Zenewicz to Sidelinger, March 20, 2000.)

6

On March 21, 2000, Dr. Smith sent a letter by email and regular mail to Mr. Sidelinger

after he again failed to show up for school and failed to notify the school that he would be

absent. (Pl. Ex. 11, Letter from Smith to Sidelinger dated March 21, 2000.)   Dr. Smith

explained that Mr. Sidelinger does "not have the option to stay away from the school

worksite."  (Pl. Ex. 11.)   Dr. Smith also addressed the ID badge issue as follows:

> I know of no obvious "positive solution that can be reached" because you have
> steadfastly refused to supply requested information about your objection to wearing
> an identification badge. Although I indicated that I required more information about
> your objection, you chose to walk out of a meeting with me rather than provide it.
> You also avoided a similar conversation with your principal. This information was
> required before the fact, not in a meeting on your terms at your convenience. You
> have unilaterally indicated that you will meet with me at 7:15 am Wednesday March
> 22, 2000. I must indicate that this may be too late for you to avoid serious
> repercussions. . . . . And, be advised, that I will not meet with you again given your
> misstatements about our previous meeting(s).

(Pl. Ex. 11.)

Mr. Sidelinger testified at trial that it was incorrect of Dr. Smith to say that Mr.

Sidelinger had refused to supply information about his objection to wearing an ID badge. (Tr.

at 39.) According to Mr. Sidelinger he had supplied the information in his previous letter

stating that he "had a very sincere moral religious belief that did not permit wearing badges."

(Tr. at 39.)

Mr. Sidelinger then met with Dr. Smith, Dr. Willard O'Neil, and Mr. Zenewicz on

March 22, 2000, in the administration office. (Tr. at 39; Pl. Ex. 23, Termination Hearing

Transcript, April 24, 2000, at 35.)   Mr. Sidelinger testified that Dr. Smith posed three

questions to him to which he responded "no". (Tr. at 40.) The three questions were: "Are you

ready to return to work?" "Do you have any medical or doctor excuse?" and "Do you have

anything else you wish to add?" (Tr. at 40.) Following the meeting, Mr. Sidelinger believed

7

that there was no possibility of the school district accommodating him, so he turned his keys

into the principal. (Tr. at 40-41.)

Next, the president of the school board, Cynthia Himes, sent a letter to Mr. Sidelinger

dated March 27, 2000, in which she stated in part as follows:

> You have indicated to the administration that you "await the formal reply to" your
> "letter dated March 12, 2000 from the board." . . . . [H]ere is a response to your
> March 12, 2000 letter.
>
> This board of school directors would never tolerate religious persecution. Frankly, I
> do not see how wearing a photo-identification badge infringes upon a religious belief.
> It is my understanding that you have been asked to provide details about your
> religious beliefs and that you have refused to do so. If there is anything that you
> would wish to provide as a basis of your objection, please reduce it to writing and
> deliver it to Dr. Smith immediately. You have been asked by the superintendent to
> provide a basis for your objection. Please be advised that the superintendent speaks
> for the school board in this matter.

(Pl. Ex. 12, Letter from Himes to Sidelinger, March 27, 2000.) Mr. Sidelinger summarized

this portion of Ms. Himes' letter during testimony as "Basically, they didn't understand my

religious belief. If anything you wanted to add, you know, reduce it to writing and deliver it to

Dr. Smith." (Tr. at 45.) Mr. Sidelinger responded to this letter by way of email to Mr.

Zenewicz, in which he addressed his refusal to wear the ID badge as follows:

> Miss Himes has stated that Dr. Smith is to reso[l]ve this matter. At present I do not
> see a resolution at hand. There is no question in my mind that the "cloud of
> persecution" put into place on [F]riday March 10, 2000 still remains. Without
> question the best for all involved would be for my return to the classroom. However,
> until[] the District is prepared to accept my written reason for not wearing the badge
> on its face value ( there is nothing to add) the "cloud of persecution" exist[s]. Again,
> I will not indulge in sins of pride, I will not indulge in sins of hypocrisy.

(Pl. Ex. 13, Email from Sidelinger to Zenewicz, March 29, 2000; Tr. at 50.)

Dr. Smith responded to Mr. Sidelinger's March 29, 2000 email in a letter dated April

3, 2000, which was delivered to Mr. Sidelinger by email and regular mail. (Pl. Ex. 16, Email

8

from Smith to Sidelinger, April 4, 2000, with attached letter from Smith to Sidelinger, April

3, 2000; Def. Ex. 16, Letter from Smith to Sidelinger, April 3, 2000.)  Dr. Smith stated that

Mr. Sidelinger's "continued refusal to wear a photograph identification badge is unacceptable

conduct from a professional employee in the Harbor Creek School District." (Pl. Ex. 16.)  Dr.

Smith also explained to Mr. Sidelinger that he was placing Mr. Sidelinger on a one-week

unpaid disciplinary suspension "based on your continued, willful, refusal to wear a

photograph identification badge." (Pl. Ex. 16.)  Dr. Smith further stated that Mr. Sidelinger's

"failure to abide by the District's call-in procedure aggravates the situation." (Pl. Ex. 16.)  Dr.

Smith elaborated on the identification badge issue as follows:

> You are instructed to appear at my office on Monday, April 10, 2000 at 7:30 a.m. At
> that time, I will again advise that you are required to wear a photograph identification
> badge. If you agree to wear one, you will be permitted to proceed to your classroom
> and to teach. If, however, you again refuse to wear the badge, you should know that I
> am reserving the right to continue your suspension and recommend your termination
> as a professional employee of the Harbor Creek School District.
>
> I believe I have been more than patient with you. You apparently claim that the
> wearing of the badge is a "sin of pride" and "sin of hypocrisy." Nevertheless, you
> have failed to identify the religious creed or faith of which you are a member and that
> subscribes to this belief. You also have not explained why you believe that the
> wearing of the photograph identification badge is a "sin of pride" and a "sin of
> hypocrisy." I believe I have been more than willing to hear and understand your "side
> of the story." For whatever reason, you have not provided me with that information.
>
> The wearing of a photograph identification badge is a necessary part of the District's
> ongoing plan to improve safety in schools. In fact, more and more school districts are
> using these kinds of badges to identify those individuals who are authorized to be in
> school buildings. As such, I think our request that you wear one is very reasonable.
>
> I hope that by the time we meet in my office on Monday, April 10, 2000, you will
> have had the opportunity to reconsider you position.

(Pl. Ex. 16.)

9

Mr. Sidelinger testified that this letter made it clear to him that the district's position

had not changed and the "only way [he] can return to teaching is wearing the badge." (Tr. at

52.)   In addition, he testified that he "had no reason to believe there was going to be any

accommodation." (Tr. at 55.)  Mr. Sidelinger responded by email to Dr. Smith on April 7,

2000. (Pl. Ex. 17, Email from Sidelinger to Smith, April 7, 2000.)  In this email, Mr.

Sidelinger explained that he was in contact with civil rights attorneys about the matter. (Pl.

Ex. 17.)  He also stated that he was "a very old fashion latin Roman Catholic."  (Pl. Ex. 17.)

At trial he testified that he grew up "back when the Mass and altar and everything was said in

Latin, quite conservative." (Tr. at 54.)  In his April 7, 2000 email to Dr. Smith, he also

explained as follows:

> I do not persecute others for their beliefs, however, in addition to identifying with not
> participating in personal adornment. I do not personally agree with other items such
> as body piercing, tat[t]ooing, adult[e]ry, children out of wedlock, divorce, and other
> actions which the District has de[a]lt with in the past where great problems have been
> allowed to exist due to religious and personal freedoms in the District. You most
> likely are not aware of these items due to being new in the District.
>
> I must notify you that I will be there Monday for you[r] meeting. However, as with
> the items listed and many more that are sincere deep seated religious and moral
> beliefs I have no intention of changing any of them.

(Pl. Ex. 17.)  Although Mr. Sidelinger did meet with Dr. Smith and Dr. O'Neil on April 10,

2000, he did not provide any information regarding his objection to wearing the Badge. (Pl.

Ex. 23, at 43.)

The next communication came in the form of a notification letter to Mr. Sidelinger

informing him that he was being charged with conduct believed to be in violation of the

Pennsylvania School Code. (Pl. Ex. 18, Letter from Himes and Fuller to Sidelinger, April 11,

2000.)  The letter set forth the charges as follows:

10

Be advised that you are being charged by the School District Administration of the Harbor Creek School District with conduct that may fall into one or more of the following categories enumerated in the Pennsylvania School Code: persistent negligence in the performance of duties, willful neglect of duties, and persistent and willful violation of or failure to comply with school laws of this Commonwealth (including official directives of and established policy of the Board of Directors). The conduct that is believed to have violated the School Code relates to your refusal to wear a District-issued photo identification badge. Aggravating this situation has been your failure to call in and report absences beginning on March 14, 2000. You had been warned about this behavior, and most recently received a 5-day suspension for it. Nevertheless, you continue to ignore the directives of the Administration. It also has been alleged that despite requests for you to provide additional information and assistance in compiling the grades for your classes in your absence, you have refused to do so.

(Pl. Ex. 18.) A hearing before the Board was scheduled for April 24, 2000. (Pl. Ex. 18.) Mr. Sidelinger was also notified that the Superintendent had suspended him without pay pending the Board's action. (Pl. Ex. 18.) The remainder of the letter set forth Mr. Sidelinger's rights, options, and procedures relating to resolving the charges. (Pl. Ex. 18.)

Mr. Sidelinger attended the April 24, 2000 hearing before the School Board. (Tr. at 57.) Attorney Mark Wassell presented the Administration's case through Dr. Smith. (Tr. at 58.) Mr. Sidelinger chose to speak only briefly at the hearing, and did not present any testimony or witnesses. (Tr. at 58; Pl. Ex. 23, Termination Hearing Transcript.) On May 1, 2000, the School Board voted to terminate Mr. Sidelinger's employment, citing the conduct given in the notification letter as three independent reasons justifying the termination. (Def. Ex.. 26; Tr. at 59.)

Subsequent to his termination, sometime in the fall of 2001, Mr. Sidelinger posted a photograph of himself along with a personal profile on two Internet dating services, Match.com and AmericanSingles.com (Def. Ex. 25, copy of 3/27/02 AmericanSingles.com profile & copy of 3/26/2002 Match.com profile; Tr. at 101-102.) Through one of these

11

services Mr. Sidelinger met and began an adulterous relationship with a woman. (Tr. at 103.)

The relationship ended, however Mr. Sidelinger's photograph and updated profile remain

active on Match.com at least as of February 28, 2006, more than four years after he first

posted his picture on this site and less than a month before trial. (Pl. Ex. 25, 2/28/2006

Match.com profile.)

## II. Applicable Law

### A. Title VII Religious Discrimination

Title VII expressly prohibits employers from discriminating between employees on the

basis of religion. Title VII provides that

> (a) It shall be an unlawful employment practice for an employer --
>
> (1) .... to discharge any individual, or otherwise to discriminate against any
> individual with respect to his compensation, terms, conditions, or privileges of
> employment, because of such individual's... religion....

42 U.S.C. § 2000e-2(a)(1).

A plaintiff establishes a prima facie case of religious discrimination by showing that

(1) he holds a sincere religious belief that conflicts with a job requirement;

(2) he informed the employer of the conflict; and

(3) he was adversely affected for failing to comply with the conflicting requirement.

Shelton v. University of Medicine & Dentistry of New Jersey, 223 F.3d 220, 224 (3d Cir.

2000), Protos v. Volkswagen of America, Inc., 797 F.2d 129, 133-134 (3d Cir.), cert. denied,

479 U.S. 972, (1986) (citing Turpen v. Missouri-Kansas-Texas Railroad Co., 736 F.2d 1022,

1026 (5th Cir. 1984)).

12

Once a prima facie case is established, the burden shifts to the defendant to produce evidence either:

(1) that it offered the employee or applicant a reasonable accommodation of her religious practices which she refused; or

(2) that no accommodation was possible without subjecting it to "undue hardship."

United States v. Board of Education for the School District of Philadelphia, 911 F.2d 882, 886 (3d Cir. 1990); Protos, 797 F.2d at 134. An undue hardship is incurred if the employer's accommodation requires it to assume more than a "*de minimis* cost." Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84 (1977).

Mr. Sidelinger contends that he notified the School District of his sincerely held moral and religious belief that conflicted with the requirement of wearing an identification badge; that the School District refused to accommodate him; and that the School District terminated his employment because of his religious belief that caused him to not wear the identification badge.

The School District contends that Mr. Sidelinger's conclusory assertion that his religious belief requires him to disobey the School District's requirement that he wear an identification badge is insufficient to prove that his professed religious belief is sincerely held. The School District argues that Mr. Sidelinger's refusal to wear the identification badge is a purely personal preference and not a sincerely held religious belief.

Related to this point, the School District also contends that Mr. Sidelinger failed to give sufficient notice of his professed religious belief by refusing to cooperate with the School District in its attempts to discern his religious beliefs beyond Mr. Sidelinger's merely

13

informing the School District that his refusal to wear the badge conflicts with his religious belief. Rather than engaging with the School District to seek an accommodation to his religious belief, the School District contends that Mr. Sidelinger unilaterally asserted an unqualified right to not wear the identification badge.

The School District also argues that Mr. Sidelinger was also validly terminated for reasons independent from his refusal to wear the badge. The School District argues that the School Board's May 1, 2000 findings of fact and conclusions of law show that Mr. Sidelinger was also terminated on the independent bases of his unauthorized and unsubstantiated absences, and his refusal to supply information necessary to calculate student grades.

Finally, the School District argues that even if Mr. Sidelinger can make out a prima facie case of religious discrimination the School District could not reasonably accommodate Mr. Sidelinger without causing it undue hardship in light of the School District's compelling interest in preserving the safety and security of its schools. The School District argues that by accommodating Mr. Sidelinger's request school security would be compromised. Thus, the School District argues that Mr. Sidelinger's request for an accommodation cannot be considered reasonable. We ruled in favor of the School District at the close of Mr. Sidelinger's evidence before the School District could introduce its evidence on this last point.

We conclude that Mr. Sidelinger has failed to set forth a prima facie case of religious discrimination. Specifically, we find that Mr. Sidelinger has failed to establish that he had a sincerely held religious belief, that he failed to provide sufficient notice to the School District

14

of his religious belief, and that he failed to show that he would not have been fired for reasons independent from his religious belief.

To establish the first two prongs of his prima facie case Mr. Sidelinger must show (1) that he holds a sincere religious belief that conflicts with School District's requirement that he wear the ID Badge, and (2) that he informed the employer of the conflict. Shelton, 223 F.3d at 224; Protos, 797 F.2d at 133. As pointed out in the EEOC's regulation defining religious belief or practice "[i]n most cases whether or not a practice or belief is religious is not at issue." 29 C.F.R. Section 1605.1. This is the rare case where whether or not plaintiff's belief is "religious" is at issue. In addition, the question of whether Mr. Sidelinger sincerely holds his religious belief overlaps with the inquiry into whether he gave sufficient notice to the School District. The resolution of both questions depends, in large part, on the information Mr. Sidelinger provided to the School District about his religious belief. Thus, the same information is used to answer whether he sincerely held a religious belief and whether he provided sufficient notice. We begin by setting forth in more detail the legal standards regarding the first two prongs of the prima facie case.

**B. Sincerely Held Religious Belief and Notice**

"The determination of what is a religion or religious belief 'is more often than not a difficult and delicate task.'" Peterson v. Wilmur Communications, 205 F.Supp.2d 1014, 1018 (E.D.Wis. 2002) (quoting Thomas v. Review Board of the Indiana Employment Sec. Div., 450 U.S. 707, 714 (1981).) "Few tasks that confront a court require more circumspection than that of determining whether a particular set of ideas constitutes a religion." Africa v. Pennsylvania, 662 F.2d 1025, 1031 (3d Cir. 1981). Nonetheless, "Title VII does require the

15

EEOC or the courts to evaluate a plaintiff's claimed entitlement to accommodation of her religious principles." Protos, 797 F.2d at 136.

"The breadth of the 'exemption' offered by Title VII is underscored by the fact that in defining religion, the EEOC has used the broad definition the Selective Service employs for conscientious objector purposes." Protos, 797 F.2d at 137 n.4 (citation omitted). "In the Selective Service context, the Supreme Court has held that to qualify as religious, a belief need not be a traditional faith, or be based on a Supreme Being; a religious belief may be one that is 'purely moral and ethical in source and content but that nevertheless imposes upon [its holder] a duty of conscience. . . .'" Id. (quoting Welsh v. United States, 398 U.S. 333, 340 (1970). The EEOC's definition of religious belief is similarly broad, stating in relevant part as follows:

### § 1605.1 "Religious" nature of a practice or belief,"

   In most cases whether or not a practice or belief is religious is not at issue. However, in those cases in which the issue does exist, the Commission will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views. This standard was developed in United States v. Seeger, 380 U.S. 163 (1965) and Welsh v. United States, 398 U.S. 333 (1970). The Commission has consistently applied this standard in its decisions. The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee. . . .

29 C.F.R. Section 1605.1 (footnote omitted). Whether a belief is a protected religious belief under Title VII does not depend on whether it is "acceptable, logical, consistent, or comprehensible to others. . . ." Thomas, 450 U.S. at 714.

16

The constitutionally significant issue raised when a court or the EEOC enquires into whether an employee's belief is religious is the danger of "excessive entanglement of government and religion" in violation of the Establishment Clause of the United States Constitution. Protos, 797 F.2d at 136. In Protos, the United States Court of Appeals for the Third Circuit was presented with the issue of whether the religious accommodation requirement of Title VII violated the Establishment Clause of the First Amendment to the United States Constitution. In finding that the religious accommodation requirement of Title VII was not unconstitutional, the Third Circuit Court explained that "[w]hile courts may not inquire into the verity of a religious belief, 'it is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity of someone's religious beliefs in both the free exercise context, and the Title VII context." Protos, 797 F.2d at 137 (quoting Philbrook v. Ansonia Board of Education, 757 F.2d 476, 481 (2d Cir. 1985), cert. granted, 474 U.S. 1080; and citing United States v. Ballard, 322 U.S. 78, 86, 88 L.Ed. 1148, 64 S.Ct. 882 (1944)).

In undertaking the evaluation of a plaintiff's claim to a religious accommodation the court "must ascertain whether the employee's belief is religious and is sincerely held, just as the government does in ruling on conscientious objector applications." Protos, 797 F.2d at 136-137 (citing Nottleson v. Smith Steel Workers D.A.L.U., 643 F.2d 445, 455 (7th Cir. 1981), cert. denied, 454 U.S. 1046). "Rather than define religion according to its content, the test requires courts take a functional approach and ask whether a belief 'functions as' religion in the life of the individual before the court." Peterson, 205 F. Supp. 2d at 1018; see also Redmond, 574 F.2d at 901 n.12 (proper test derived from Welsh and Seegar is "(1) is the 'belief' for which protection is sought 'religious' in person's own scheme of things, and (2) is

17

it 'sincerely held''). "So long as the belief is sincerely held and is religious in the plaintiff's scheme of things, the belief is religious regardless of whether it is 'acceptable, logical, consistent, or comprehensible to others.'" Peterson, 205 F. Supp. 2d at 1019 (quoting Thomas, 450 U.S. at 714).

In "some contexts, as was the case in Seeger, it is appropriate to examine or inquire into the sincerity of an individual's belief and whether the belief is, in fact religious, before permitting special accommodation to be made based upon that belief." Bushouse v. Local Union 2209, UAW, 164 F. Supp. 2d 1066, 1075 (D. Ind. 2001) (citing Seeger, 380 U.S. at 185 ("the threshold question of sincerity ... must be resolved in every case."). The United States Supreme Court has explained that the "validity of what [a professed conscientious objector] believes cannot be questioned." Seeger, 380 U.S. at 184. In the case of a conscientious objector who believes that it is wrong to kill another even during a war, a court cannot question this belief and proclaim the belief invalid, 'not true,' or otherwise rule that one is not entitled to hold that belief. Similarly in determining whether a plaintiff's belief is religious a court "should not attempt to assess a belief's 'truth' or 'validity.'" Peterson, 205 F. Supp. 2d at 1018-1019 (quoting Seeger, 380 U.S. at 184-85; and citing Thomas, 450 U.S. at 714 (Resolution of whether a belief is religious does "not turn upon a judicial perception of the particular belief or practice in question."); and Hobbie v. Unemployment Appeals Commission of Florida, 480 U.S. 136, 144 n.9, 94 L. Ed. 2d 190, 107 S. Ct. 1046 (1987) (stating that truth of plaintiff's beliefs is irrelevant)).

"While the 'truth' of a belief is not open to question, there remains the significant question of whether it is 'truly held.'" Seegar, 380 U.S. at 185. The burden is on the plaintiff

18

to show that he holds a sincere religious belief in conflict with his employer's requirements. Bushouse, 164 F. Supp. 2d at 1076 (citing EEOC v. Ilona of Hungary, Inc., 108 F.3d 1569, 1575 (7th Cir. 1997)). "[I]if the religious beliefs that apparently prompted a request are not sincerely held, there has been no showing of a religious observance or practice that conflicts with an employment requirement." Ilona of Hungary, Inc., 108 F.3d at 1575; EEOC v. Unión Independiente De La Autoridad De Acueductos Y Alcantarillados De Puerto Rico, 279 F.3d 49, 56 (1ˢᵗ Cir. 2002); Bushouse, 164 F. Supp. 2d at 1076; Massie, 381 F.Supp.2d at 100. Thus, "Title VII does permit an inquiry into the sincerity and religious nature of an employee['s] . . . purported beliefs before the duty to accommodate such a belief arises, . . ." Bushouse, 164 F. Supp. 2d at 1075. "The finding on this issue generally will depend on the factfinder's assessment of the employee's credibility." Unión Independiente De La Autoridad, 279 F.3d at 56 (citing Ilona of Hungary, Inc., 108 F.3d at 1575 and Nottleson, 643 F.2d at 454).

## III. Discussion

Initially we note that Mr. Sidelinger claims to be a Roman Catholic, but he does not contend that his religious belief is a tenet or practice of the Catholic church, nor does he contend that his religious belief is a tenet or practice of the"very old fashion latin Roman Catholic" church. In fact, Mr. Sidelinger did not present any evidence from a priest, employee, or member of his church, and he does not contend that his belief is a belief of his church. Rather, he explained that his belief stems from the Catholic Church teaching that sin is determined by one's own conscience and that sin is a matter between one's own conscience and God. (Tr. at 74-75, 127, 132.) Thus, in this case we do not determine if Mr. Sidelinger's belief is 'religious' based on whether his belief is recognized within the Catholic church.

19

We also do not question whether it is valid to believe that it is a sin to wear a photograph identification badge, and begin with the presumption that a person is entitled to hold a religious belief that prohibits them from wearing an ID Badge. We do, however, make the permitted inquiry as to whether Mr. Sidelinger's belief is sincerely held and "religious" in his own scheme of things. Protos, 797 F.2d at 136-137 (necessary to inquire into whether the belief is religious and is sincerely held similar to analysis in ruling on conscientious objector applications); 29 C.F.R. Section 1605.1 (religious belief will include beliefs sincerely held with the strength of traditional religious views). In addition, we also examine whether Mr. Sidelinger provided sufficient notice of his religious objection to the work requirement.

Our conclusion that Mr. Sidelinger has failed to state a prima facie case depends on our finding that Mr. Sidelinger is not credible. Thus, we will begin by discussing our credibility determination, before turning to our analysis of Mr. Sidelinger's prima facie case. .

### A. Mr. Sidelinger's Credibility

In general we found Mr. Sidelinger's testimony to be not credible. We made this ruling based, in part, on our observation of Mr. Sidelinger's bearing and demeanor, the character of his testimony, and several inconsistencies and discrepancies in his testimony. In general, a consistent theme in Mr. Sidelinger's testimony was an unwillingness to provide straightforward answers. We will discuss two of the most glaring credibility problems from the trial at length: his testimony regarding the March 10, 2000 meeting with Dr. Smith, and his testimony regarding posting his photograph and profile on the Internet. These are not the only instances where we found Mr. Sidelinger's credibility to be lacking and where appropriate we will refer to other instances in our discussion.

20

### *March 10, 2000 Meeting*

Mr. Sidelinger tape recorded the conversation of March 10, 2000, with Dr. Smith. By March 12, 2000, he had written and delivered a letter to the School Board in which he grossly misrepresented what Dr. Smith had said at the meeting, even though he had the capability of checking his recollection against the recording of what Dr. Smith actually did say. Moreover, he did not represent to the School Board that he was relying on his memory, but that what he was reporting had in fact occurred and he even purported to attribute a quote to Dr. Smith that never happened when he wrote the following:

> On Friday March 10, 2000 Dr. Smith again met with myself to confirm that my moral and religious beliefs would not be tolerated. At that time he asked me to consider changing my moral and religious convictions over the weekend. In addition he issued a verbal warning/threat "*that if I did not change my moral and religious convictions* that I would receive a three day suspension beginning on Monday March 13, 2000".

(Pl. Ex. 8 (emphasis added).)

Mr. Sidelinger used similar language when describing the March 10, 2000 meeting in his charge of discrimination to the EEOC dated November 17, 2000. (Def. Ex. 32; Tr. at 98.) In the Charge he again purported to be quoting Dr. Smith directly when he stated "On 3/10/2000 Dr. Smith warned and threatened 'that *if I did not change my moral and religious convictions* and show up for work on the 13th wearing the badge, I would be suspended.'" (Pl. Ex. 32 (emphasis added).)

As is readily observed from the transcript of the March 10, 2000 tape recorded meeting, Dr. Smith warned Mr. Sidelinger about what the consequences would be for refusing to obey the requirement of wearing the ID badge. Dr. Smith said nothing about Mr. Sidelinger's moral and religious beliefs. In addition, Dr. Smith clearly invited Mr. Sidelinger

21

to discuss the issue with him on Monday, and to bring a representative if he wanted. Finally, Dr. Smith stated that if he refused to wear the badge, Mr. Sidelinger's suspension without pay would begin on Tuesday. We conclude that based on what Dr. Smith actually said at the March 10, 2000 meeting that it was unreasonable for Mr. Sidelinger to believe that Dr. Smith was asking Mr. Sidelinger to change his moral and religious convictions.

At trial Mr. Sidelinger explained that he had never listened to the audio tape until after he received the transcript of the tape recording during discovery several years later, and that he was reporting his recall of the meeting. (Tr. at 92, 98-99.) Based on the transcription of the March 10, 2000 meeting and Mr. Sidelinger's testimony, we find Mr. Sidelinger's explanation to be not credible. In fact, until confronted during cross-examination with evidence that his written recollections of the meeting were radically different from the tape transcription, Mr. Sidelinger maintained at trial that during the March 10, 2000 meeting he was "told to go home and re-think [his] religious belief" and that after the meeting he "was emotionally devastated to think that anyone in a public sector, would ask somebody to change their deeply held moral and religious convictions." (Tr. at 24, 25-26.) In other words, until defense counsel asked him to explain the discrepancy, Mr. Sidelinger was willing at trial to continue to assert his distorted version of what happened at the meeting even though by then he knew that his version did not match up with the actual transcription.

Moreover, as far back as March 22, 2000, Dr. Smith brought to Mr. Sidelinger's attention the fact that Mr. Sidelinger's recollection of the meeting was wrong when he advised him that he "will not meet with you again given your misstatements about our previous meeting(s)." (Pl. Ex. 11.) Thus, Mr. Sidelinger was on notice that his report of what Dr.

22

Smith said was wrong well before the November 17, 2000 Charge of Discrimination was prepared, and he certainly knew before he gave his trial testimony that Dr. Smith never asked him to change his moral and religious convictions.

### *Mr. Sidelinger's Internet Activity*

Mr. Sidelinger's testimony regarding his posting of a profile on the internet also demonstrated that he was not credible. Defendant's Exhibit 25 consists of printouts of three profiles for Mr. Sidelinger. (Def. Ex. 25.) During cross-examination defense counsel, while referring to Defendant's Exhibit 25, asked Mr. Sidelinger if he had posted an advertisement on the internet and he affirmed that he had "posted two ads on the Internet for dating service in year 2001, and I have already said that that was very sinful on my part." (Tr. at 101-102.)

The second profile of Defendant's Exhibit 25 is Mr. Sidelinger's profile for the AmericanSingles.com service, with a date printed on the lower right hand corner of the document of 3/27/02. (Pl. Ex. 25, 3/27/2002 AmericanSingles.com profile.) The third profile of Defendant's Exhibit 25 is Mr. Sidelinger's profile for the Match.com service, with a date printed on the lower right hand corner of the document of 3/26/02. (Pl. Ex. 25, 3/26/2002 Match.com profile.) In the 3/26/2002 profile, Mr. Sidelinger listed his income as $100,000 to $149,999. (Pl. Ex. 25, 3/26/2002 Match.com profile.) Mr. Sidelinger testified that he indicated that income range because he believed he would be returning to teaching with a salary of $55,000, and combined with income from roofing ($30,000-35,000) and his maple syrup business ($15,000), he would be in the $100,000 range. (Tr. at 102-103.)

Defense counsel then questioned Mr. Sidelinger about the first profile of Defendant's Exhibit 25, which is also Mr. Sidelinger's profile for the Match.com service, but with a date

printed on the lower right hand corner of the document of 2/28/2006, four years later than the

other Match.com profile. (Pl. Ex. 25, 2/28/2006 Match.com profile.) Mr. Sidelinger first

explained that he assumed that once he had stopped paying for the services that his profiles

were taken off the Internet, and that he had not been back to either service since March 2002.

(Tr. at 103-104.) In the more recent 2/28/2006 Match.com profile, Mr. Sidelinger's income is

indicated as $35,001 to $50,000. (Pl. Ex. 25, 2/28/2006 Match.com profile.)  Based on the

difference in income listed in the two profiles dated four years apart, defense counsel

questioned Mr. Sidelinger as follows:

> Q. When did you update the salary range on your online profile? This one
> says that you make 35 to $50,000 on the second page?
> A. I do not recall updating it. I'm quite sure that people that can play with the
> computers could do anything that they want with this.

(Tr. at 104.)    We note that Mr. Sidelinger did not simply deny that he changed his income

range on the profile. Instead he carefully responded by stating that he did not recall changing

his income, and offered a possible explanation for how it was changed. Defense counsel

continued questioning Mr. Sidelinger as follows.

> Q. You think that's what happened?
> A. I don't know.
> Q. Maybe you changed it?
> A. No, I don't think so.
> Q. How do you know?
> A. Because I put the initial information in and then I didn't change it after that.

(Tr. at 104.) Now that Mr. Sidelinger affirmatively testified that he did not change the

information, Defense counsel reminded Mr. Sidelinger of his initial response.

> Q. I thought your testimony was you don't remember when you changed it?
> A. That if I changed it, I don't remember, but I can guarantee - - I can
> guarantee that I put the initial information in and that I never changed it after

24

that. Somebody else playing a game.

Q. So, if the information changed, that would have to be - -

A. It would definitely have to be somebody else.

Q. What they did in terms of monkeying with your ad was to go in there and reduce your income?

A. I've never even, prior to this moment in time, I never knew that was done.

(Tr. at 104-105.) So Mr. Sidelinger finally decided that his answer was that he put the initial information in and never changed it, but if he did change it he does not remember changing it, and if it actually is changed, then someone else made the changes.

We find the above testimony to be not credible. Not only are Mr. Sidelinger's responses equivocal, but also he failed to explain why the person who was allegedly playing around with his profile chose to only change his income, and chose to change his income to fortuitously match what Mr. Sidelinger's income would be without his $55,000 teaching salary. Finally, Mr. Sidelinger unsatisfactorily addressed the fact that his photograph and profile were active four years after he testified that he had never been back to the site. Given his lack of credibility regarding these issues we instead find that Mr. Sidelinger maintained his photograph and profile on Match.com at least up to February 28, 2006.

## B. Whether the Religious Belief is Sincerely Held and Religious

From the moment Mr. Sidelinger asserted to school officials that he had a religious belief in conflict with wearing the photograph identification badge he has maintained that he conveyed all the information that he is obligated to give under Title VII, and the school received all the information it needed to accommodate Mr. Sidelinger. Mr. Sidelinger never wavered from his view that he had already provided all that was necessary and that the School District was not permitted under the law to any further information. Mr. Sidelinger

25

maintained this view up to and including the trial. In the face of Mr. Sidelinger's
steadfastness the School District consistently and repeatedly explained to Mr. Sidelinger that
it did not understand his bare bones claim that he had a religious objection to wearing the
identification badge. Despite knowing that the School District sought more information Mr.
Sidelinger erroneously concluded that the School District was not permitted to ask for such
information and that he did not have to provide it.

The EEOC explicitly states that in "most cases whether or not a practice or belief is
religious is not at issue." 29 C.F.R. 1605.1. Where the claimed belief does not appear to be a
recognizable religious belief or practice, the objector must expect that his employer will
inquire into the religious basis of the belief. When the asserted belief or practice is an obvious
religious belief or practice, the employer may require little or no information to satisfy itself
that the objector is indeed making a religious claim. Even in cases where the religious belief
or practice is presumed, the objector still must satisfy his employer that the religious belief or
practice is sincerely held. As one commentator put it:

> A person may insincerely advance a religious claim or sincerely make a claim that
> turns out not to be religious. A person may even do both at the same time by asserting
> a package of beliefs, some of which are sincere but nonreligious and others of which
> are religious but insincere.

Kent Greenawalt, RELIGION AS A CONCEPT IN CONSTITUTIONAL LAW, 72 Calif. L. Rev. 753,
816 n.7 (1984).

This is not a case where the religious belief is obvious or is easily explained resulting
in no need for an inquiry into this aspect of the prima facie case. Mr. Sidelinger's objection to
wearing the ID Badge -- that it goes against his moral and religious convictions and would
require him to engage in the "sin of pride and the sin of hypocrisy" -- is a belief that cries out

26

for explanation as a "religious" belief. The fact that wearing an ID Badge, whether at a convention, a social function, a job, or any other venue, is a common event that appears to cut across nearly every conceivable factor, such as age, gender, race, and even religion, reinforces the fact that Mr. Sidelinger's objection was not obviously a "religious" objection. Thus, it is expected that an employer would make an inquiry of such a religious belief.

While the extent of the inquiry may vary in individual cases, a "person who seeks to obtain a privileged legal status by virtue of his [religious belief] cannot preclude inquiry designed to determine whether he has in fact a [religious belief]." Seshadri v. Kasraian, 130 F.3d 798, 800 (7th Cir. 1997). But "preclude inquiry" is exactly what Mr. Sidelinger claims he is entitled to do in this case. Several times during trial, counsel for Mr. Sidelinger emphasized that the law restricts the employer's inquiry to examining only whether the plaintiff sincerely held the religious belief, while prohibiting an inquiry into whether the belief was in fact "true," since "courts may not inquire into the verity of a religious belief." Protos, 797 F.2d at 137. Mr. Sidelinger's stated concern was that the School District on cross-examination was wrongfully attempting to inquire into the 'verity' of Mr. Sidelinger's belief. Thus, he consistently fought against any inquiry by the School District that he believed was aimed at judging his belief as "not true" both at trial and before he was terminated.

While Mr. Sidelinger is correct on the scope of the inquiry, in practice his firm position is that the School District was totally prohibited from making any inquiry once he stated that he had a religious belief that conflicted with the requirement of wearing an ID badge. Mr. Sidelinger asserts that he had met both the first and second elements

27

of his prima facie case by conveying that he had a religious belief that conflicted with wearing the ID Badge. We disagree.

If Mr. Sidelinger's position were correct, it would permit any employee to claim almost any imaginable belief as a religious belief that conflicts with a work requirement. For example, an employee "could announce without warning that white walls or venetian blinds offended his 'spirituality' . . . ." Reed v. The Great Lakes Companies, Inc., 330 F.3d 931, 934 (7th Cir. 2003). Or he might claim that it was part of his religion to wear sunglasses, "a claim 'so bizarre ... as not to be entitled to protection' under the First Amendment." Levitan v. Ashcroft, 281 F.3d 1313, 1321 (D.C. Cir. 2002) (quoting Thomas, 450 U.S. at 715.) Under Mr. Sidelinger's view of the law even in these examples the employer would then be prohibited from making an inquiry into the employee's stated belief, and would have to accommodate the employee. However, as the above recitation of the applicable law shows, Mr. Sidelinger is simply wrong about what Title VII and the case law require. The School District was permitted to inquire as to whether Mr. Sidelinger's asserted religious belief was sincerely held and religious in his own scheme of things.

In a case involving a religious objection to paying union dues the plaintiff also argued "that he met his burden by merely telling the Union that he held sincere religious beliefs that conflicted with the requirement that he pay dues to a union." Bushouse, 164 F. Supp. 2d at 1076. The Court explained that a "limited inquiry into the sincerity of a [plaintiff's] claimed religious beliefs allows the [employer] to ascertain whether an individual is motivated by sincere religious convictions as opposed to political or other convictions which might be used

by a member to avoid a particular [employer] requirement." Bushouse, 164 F. Supp. 2d at 1076 n.15.

In Bushouse, the Court noted that "[c]ertainly, Bushouse initiated the process of requesting religious accommodation by informing the Union of his religious beliefs and that they conflicted with paying union dues." Id. However, the Union "questioned whether his beliefs were truly held and religious rather than political." Id. The Bushouse Court then explained that at this point, "the burden remained with Bushouse to submit some evidence, aside from his general assertions, to support his contention that he sincerely held religious beliefs that conflicted with his union obligation to pay dues." Id. From September 1999 through March 2001, the plaintiff failed "to provide acceptable 'independent corroboration' that his beliefs were truly held" as required by the Union. Id. In March 2001, the plaintiff finally provided independent corroboration of his religious belief, which the Union accepted. However, the Court found no fault with the Union in making its inquiry "since Bushouse made no offer of any proof to them in any other form to establish the sincerity and religious nature of his beliefs," and thus the Court concluded that the Union did not violate Title VII by making some inquiry into the facts and circumstances of Bushouse's claim that his beliefs were religious and that they were sincerely held." Id.

Similarly, Mr. Sidelinger initiated the process of requesting a religious accommodation by informing the School District that his religious belief prevented him from wearing the ID Badge. But the School District was unable to grasp the religious objection Mr. Sidelinger was making and thus asked him to provide more information to help the School District understand how his religious belief was a sincerely held religious belief, rather than just a

29

personal preference.  At this point, contrary to Mr. Sidelinger's contention, the burden remained with him "to submit some evidence, aside from his general assertions, to support his contention that he sincerely held [a] religious belief[] that conflicted with" the requirement to wear the Badge. Id.

As discussed below, the additional information Mr. Sidelinger provided to the School District did not help. He explained that wearing the Badge would be indulging in the sins of pride and hypocrisy contrary to his religious belief, and he stated that he was an old-fashioned, very conservative Roman Catholic. Mr. Sidelinger offered no more information or explanation, or submitted any independent evidence, "to establish the sincerity and religious nature of his beliefs." Id. We turn now to an examination of the information Mr. Sidelinger did provide regarding his religious objection to wearing the Badge.

### 1. Information Provided by Mr. Sidelinger

The School District's efforts to understand Mr. Sidelinger's objection to wearing the ID Badge and Mr. Sidelinger's refusal to engage with the School District proceeded as follows. The first time Mr. Sidelinger was asked to explain his refusal to be photographed or to wear the photograph identification badge he responded in writing stating that it "is not acceptable due to very deep personal moral and religious convictions that do not permit such actions." (Pl. Ex. 3.) He met with Dr. Smith in person on Monday March 6, 2000, where he explained his convictions stem from his experiences as a Scout that led him to cease engaging in self-adornment.  However, this explanation did not help Dr. Smith in understanding Mr. Sidelinger's objection. (Tr. at 147, 149-150.)

Dr. Smith and Mr. Sidelinger again met on Friday March 10, 2000. At that meeting Dr. Smith advised Mr. Sidelinger that he wanted him to think about wearing the badge over the weekend and to come to school Monday prepared to wear the badge. (Pl. Ex. 5.) If he did not agree to wear the badge, Dr. Smith stated that he would suspend Mr. Sidelinger without pay on Tuesday, Wednesday and Thursday. (Pl. Ex. 5.) Dr. Smith also explained that Mr. Sidelinger could appear on Monday with a representative or without one, and that Dr. Smith was willing to talk about the issue. (Pl. Ex. 5.) Mr. Sidelinger tape recorded this meeting, but he did not respond or engage in a discussion with Dr. Smith. (Tr. at 22-23.)

Despite Dr. Smith's invitation to discuss the issue in the presence of Mr. Sidelinger's representative, Mr. Sidelinger chose to conclude that Dr. Smith actually had threatened him with an ultimatum. (Tr. at 24.) In his March 12, 2000 letter to the School Board Mr. Sidelinger reported that at the March 10, 2000 meeting Dr. Smith falsely "confirmed" that Mr. Sidelinger's moral and religious beliefs would not be tolerated; that Dr. Smith asked Mr. Sidelinger to consider changing his moral and religious convictions over the weekend; and that Dr. Smith threatened the three day suspension if Mr. Sidelinger did not change his moral and religious convictions. (Pl. Ex. 8.) In the same March 12, 2000 letter, which later Mr. Sidelinger cited to the School Board as including all necessary information relevant to his belief, he explained that he "will not indulge in sins of pride" and he "will not indulge in sins of hypocrisy." (Pl. Ex. 8.)

In an email dated March 20, 2000, Mr. Zenewicz reiterated to Mr. Sidelinger that the School District was not understanding Mr. Sidelinger's position. (Pl. Ex. 10.) Mr. Zenewicz explained to Mr. Sidelinger that he needed "to articulate [his] position in the

31

'misunderstanding' in the proper manner and not avoid conversation by not being present."
(Pl. Ex. 10.)

On March 21, 2000, Dr. Smith again explained to Mr. Sidelinger that the School
District still did not understand the basis for his objection noting that Mr. Sidelinger
"steadfastly refused to supply requested information about [his] objection to wearing an
identification badge." (Pl. Ex. 11.) Dr. Smith recounted that when he did ask for more
information, Mr. Sidelinger "chose to walk out of a meeting . . . rather than provide it." (Pl.
Ex. 11.) He further stated that Mr. Sidelinger had "also avoided a similar conversation with
[the] principal." (Pl. Ex. 11.)

Dr. Smith again asked for the basis of Mr. Sidelinger's objection at the March 22,
2000 meeting, in which Dr. O'Neil and Mr. Zenewicz were also present. (Pl. Ex. 23, at 35;
Def. Ex. 26, at ¶ 4.) Again, Mr. Sidelinger failed to provide any information. (Pl. Ex. 23, at
35; Def. Ex. 26, at ¶ 4.)

In her March 27, 2000 letter, School Board President Cynthia Himes explicitly stated
to Mr. Sidelinger that she did "not see how wearing a photo-identification badge infringes
upon a religious belief." (Pl. Ex. 12.) She reiterated to Mr. Sidelinger that he had been asked
by the superintendent to provide a basis for his objection but had refused to provide one. (Pl.
Ex. 12.) She again asked him to provide a basis for his objection in writing. (Pl. Ex. 12.)
Thus, the superintendent, the High School principal, and the School Board President were all
on record has having explained to Mr. Sidelinger that none of them understood the basis of his
objection to wearing the identification badge. Despite this, Mr. Sidelinger demanded that they
accept his "written reason for not wearing the badge on its face value." (Pl. Ex. 13.)

32

In his April 3, 2000 letter, Dr. Smith briefly set forth Mr. Sidelinger's refusal to

provide information that would help him understand Mr. Sidelinger's objection:

> You apparently claim that the wearing of the badge is a "sin of pride" and "sin of
> hypocrisy." Nevertheless, you have failed to identify the religious creed or faith of
> which you are a member and that subscribes to this belief. You also have not
> explained why you believe that the wearing of the photograph identification badge is
> a "sin of pride" and a "sin of hypocrisy." I believe I have been more than willing to
> hear and understand your "side of the story." For whatever reason, you have not
> provided me with that information.

(Pl. Ex. 16 & Def. Ex. 16.) In response to this letter, Mr. Sidelinger identified that he was "a

very old fashion latin Roman Catholic," identified body piercing, tattooing, adultery, children

out of wedlock, and divorce as "other items" he does not personally agree with, and noted that

he had no intention of changing his "sincere deep seated religious and moral beliefs." (Pl.

Ex. 17.) The only new information was Mr. Sidelinger's identification of his religion, but as

noted he does not rely on his religion to show that his belief is religious. In any event, Dr.

Smith testified that he did not understand the phrase "old-fashioned latin Roman Catholic"

and assigned Dr. O'Neil to investigate what the phrase meant. (Tr. at 166.) Dr. O'Neil made

inquiries of the Catholic Diocese and some priests, but he was unable to determine the

meaning or context of the phrase "old-fashioned Roman Catholic." (Tr. at 166-167.)

Mr. Sidelinger was also given the opportunity to explain the basis for his objection at

the April 10, 2000 meeting, but he did not do so. (Pl. Ex. 23, at 43.) Finally, at his

termination hearing Mr. Sidelinger was given several opportunities to explain, expand, or

otherwise clarify his objection, but he chose not to provide any information beyond the March

12, 2000 letter on the advice of counsel. (See Pl. Ex. 23, at 47 (Counsel for the School

District urges Mr. Sidelinger to explain his position or cross-examine Dr. Smith); 51-52

33

(Counsel asks Mr. Sidelinger to provide any legal authority that might support his position); 52 (Counsel suggest that it's "in your best interests,. . . that you pass that information on to the board today"); 54 (Counsel suggests to Mr. Sidelinger that now is the time to articulate his religious objection); 55 (Counsel states to Mr. Sidelinger that he too does not understand his objection based on what he has provided).)  In fact, Mr. Sidelinger stated at that hearing that the termination hearing was "neither the place nor the time to discuss religious beliefs." (Pl. Ex. 23, at 54.)

Every person who heard his objection to wearing the badge told him that they did not understand the objection.  Still, Mr. Sidelinger rested solely on his stated reason that he objects to wearing the badge based on moral and religious convictions and that wearing the badge would be indulging in the sins of pride and hypocrisy.  (Pl. Ex. 13; Pl. Ex. 8.)  Mr. Sidelinger's position that he need offer no more than a conclusory assertion that he has a religious belief in conflict with a job requirement is an erroneous interpretation of the law and insufficient to meet his burden on his prima facie case.

In addition to his personal refusal to provide information to the School District regarding his belief, he also never submitted any evidence at any time, whether it be by affidavit, letter, or testimony, from any person connected with his church or  his religion, or any other person in his personal life, who could attest to the fact that Mr. Sidelinger sincerely holds a religious belief that prohibits him from wearing an ID Badge.  Likewise, he offered no evidence or testimony from any source other than himself to show that he indeed has refrained from wearing adornments or that his belief 'functions as' religion in his life.

34

At trial, Dr. Smith, who we found to be a credible witness, continued to express his

bewilderment as to the religious nature of Mr. Sidelinger's objection.   Given the information

Mr. Sidelinger did provide during March and April 2000, Mr. Sidelinger's counsel asked Dr.

Smith what more he was looking for:

> Q.  What more were you looking for to satisfy you that he was talking about a
> religious belief as opposed to some political, social or economic belief?
> A.  I did not understand what he was trying to put together, the picture he was
> trying to put together for me, that this was a religious practice, that having this
> belief, that that was something he did consistently, I didn't see it.

(Tr. at 155.)  Dr. Smith was then asked if he understood the objection today, and he answered:

> A.  After going through this since the year 2000 and watching this thing go
> back and forth, I'm still confused.
> Q.  So, to this day, you still don't know that he has any religious belief?
> A.  No, I don't know that I could describe his religious belief.

(Tr. at 155.)

Dr. Smith also testified that he was open to hearing what Mr. Sidelinger would have to

say to explain his objection, but that he could not speculate on what he would have done since

Mr. Sidelinger never engaged the School District in discussing the issue.  (Tr. at 160, 168-

170.)  Specifically, counsel's questions and Dr. Smith's answers were as follows:

> Q. . . .  Was there any -- if he came up with, you know, some Buddhist or
> Islamic tenet that you thought you could look up to exempt him from wearing
> the photo identity, would you have accepted that and made an accommodation?
> A.  The purpose of the [planned] meeting [for Monday, March 13, 2000] was
> to have a discussion.  I don't know where the discussion would have gone.

(Tr. at 160.)

> A.  I was looking for any explanation of this belief.  I would have entertained
> anything he told me.
> Q.  What would it have taken for him to convince you -- what would his
> burden of proof had to be to convince you that you should consider an

35

accommodation for him?
A. When you phrase it that way, that I would consider an accommodation?
We have to look at the safety program and say, is the safety program
compromised by people who don't wear the ID badge and the answer is yes.

   To what degree can I put all that aside and say, there is a religious
objection here that must be heard. I'd surely have to hear from counsel and I'd
surely have to hear from Mr. Sidelinger's priest or his representative or
someone who he's engaged to convince -- that would convince us that such a
very important program should be set aside to accommodate a religious belief.

   This is all speculation because I haven't heard -- I didn't hear anything
that rose to any level at all that I understood his belief.

(Tr. at 168-169.)

Q. What if it were a matter of personal conscience as opposed to a religious
belief? If you were convinced that it was a matter of sincere personal
conscience as opposed to being associated with a religious faith, would you
have entertained providing an exemption to the identification project?
A. All that could have been discussed but we never got there.

(Tr. at 170.)

Mr. Sidelinger's counsel's line of questioning appeared to be, in part, designed to show that

Dr. Smith would not have allowed any accommodation for anyone even if they did have a

bona fide religious belief or objection based on a matter of personal conscience. Dr. Smith's

emphasis on the importance of the security aspects of the Badge tended to show that he had a

high threshold before he would grant an accommodation, but as Dr. Smith repeatedly testified,

it never got to the point where the School District had an understandable religious objection to

consider.

   The evidence already demonstrates that Mr. Sidelinger himself was not willing to

explain his objection any further than he did. Mr. Sidelinger's obstinance in this matter

appears to be at least partly motivated by the fact that to substantively respond to the School

District's bewilderment about his objection would only expose that his objection is not in fact

a sincerely held religious belief. Seen in this light, Mr. Sidelinger's strategy to wrap himself in the protection of the prohibition on inquiries into the verity of his religious belief by overbroadly interpreting it to prohibit *any* inquiry is understandable. As discussed below, the limited information he did provide demonstrates the problems that arise when trying to view his objection as a sincerely held religious belief.

Mr. Sidelinger eventually explained during his deposition that his observations of the faculty members that were wearing ID Badges led him to conclude that they were committing the sin of pride, were boasting of themselves, and identifying themselves as better than others. (Tr. at 65-67, 127-128.)  Mr. Sidelinger suggested that he believed that when the School District instructed him to wear the ID Badge, the School District was also instructing him to become as the other faculty members were and engage in the sin of pride. (Tr. at 67.)  This testimony reveals the weakness of his objection. It is patently obvious that no one in the School District was instructing faculty members to become prideful and see themselves as better than others by instructing them to wear an ID Badge. Had he sought assurances from the School District that this was not the case, he would have received such assurances.

We note that it is possible that by wearing an identification badge a person may as a result feel pride, perhaps. It is difficult, however, to understand how this becomes "undue" pride, rising to the level of a sin, especially in light of the fact that the badge was merely an identification of the person, not an honor or merit. It may be that one would feel a sense of pride about their work or organization, a feeling that may be enhanced by an identification badge, but it is difficult to understand a religious objection to the requirement. Moreover, all employees would wear the badge, thereby eliminating any pride that would come from a

37

feeling that one was unique. So it is no surprise that Dr. Smith and others in the School District asked Mr. Sidelinger to explain the basis for his objection.

As for the sin of hypocrisy, we confess we are hard pressed to come up with a reasonable explanation in favor of Mr. Sidelinger's position. He did not expand on his assertion to anyone in the School District. Again, it is no surprise that Dr. Smith, Dr. Zenewicz, and Ms. Himes believed that further information was needed to understand the objection. Mr. Sidelinger later explained during his deposition that wearing the badge would in some way be putting him in the position of worshiping the badge and that he believed that the administration wanted him to worship the badge in some way as a false idol or false god. (Tr. at 69-70.) We note, however, that Mr. Sidelinger never offered this explanation to the administration during the relevant time period, and never asked if the School District indeed wanted him to worship the badge. (Tr. at 70-71.) Again, it is clear that if Mr. Sidelinger seriously believed that the School District expected him to worship the Badge, and had he inquired, he would have been assured that no one was instructing him to worship the Badge.

In this regard, his objection is more akin to a religious objection to the paint color of an office. We emphasize that it is not impossible for an individual to have a bona fide religious objection to a paint color or to wearing an ID badge. However, once such a religious objection is made the employer is entitled to determine whether the belief is religious and sincerely held, or whether it is a personal preference. In this case Mr. Sidelinger refused to provide sufficient information to assist the School District. We conclude that he refused to provide more information because he in fact does not sincerely hold the religious belief that he is prohibited from wearing an ID Badge. In other words, we find that Mr. Sidelinger's

38

objection to wearing the required ID Badge was a purely personal preference and "an employee is not permitted to redefine a purely personal preference or aversion as a religious belief." Reed, 330 F.3d at 935 (citations omitted).

The Court also notes that Mr. Sidelinger's belief that he is prohibited from wearing a photographic identification badge is undermined in light of his testimony regarding the contours of his belief in the prohibition of certain adornments, as well as his testimony regarding being photographed.

### *Testimony Regarding Adornments*

He was asked if his aversion to wearing jewelry was based on a religious belief, and he responded with a conditional testifying that "If the jewelry is adornment, yes." (Tr. at 124.) This leaves some room for the wearing of jewelry when it is not adornment, though we have no evidence clarifying Mr. Sidelinger's views, or even a satisfactory explanation of what "adornment" means.

He also testified that he didn't recall buying an amethyst pendant necklace for his paramour but admitted that he may have. (Tr. at 124.) In any event he explained that even if he had purchased a necklace for her, that the decision was her choice. (Tr. at 124.) The implication from this testimony is that *perhaps* Mr. Sidelinger believes it is a sin to wear jewelry (that is not adornment), but that even if it is a sin Mr. Sidelinger does not believe that purchasing jewelry for another to wear is contrary to his belief. At best, Mr. Sidelinger appears to have been happy to assist his paramour in engaging in conduct contrary to his own religious belief because he presumably benefits from having a satisfied paramour.

39

We note that Mr. Sidelinger was saved from having to explain how, in his scheme of things, a mustache (which Mr. Sidelinger had) or combing one's hair is not considered contrary to his beliefs, by his counsel's objections that such inquiries were prohibited. (Tr. at 128.)   We overruled such objections but defense counsel did not follow up for a response and moved on to other areas. (Tr. at 129.)

### *Testimony Regarding Photographs and the Internet Postings*

Mr. Sidelinger's testimony regarding his view of being photographed was also unclear, although he finally settled on the position that he did not have a religious objection to being photographed. At trial, he first testified that his objection to having his photograph taken for the yearbook was "partly religious." (Tr. at 76.)   He also testified that his objection was partially motivated by the non-religious factor of not wanting to have his picture degraded by or mocked by students. (Tr. at 77.)   However, when asked to explain what the "partly religious" objection was, Mr. Sidelinger testified that he "never considered religious at the time. Religious was not entered in my mind as far as not having my photograph put in the yearbook." (Tr. at 77.)

Similarly, Mr. Sidelinger offered unclear testimony as to why he refused to have his photograph taken for the badge. Initially, it appeared that Mr. Sidelinger refused to be photographed for the identification badge because of his religious belief. (Tr. at 10-11.) When asked "what religious belief would it have offended to have your photograph on that photo ID badge?" Mr. Sidelinger testified "First commandment, sin of pride, sin of hypocrisy, adornment. It's all related." (Tr. at 78.)   Defense counsel then sought more clarification from Mr. Sidelinger:

40

Q. Merely putting your face on the badge?

A. No, putting my face on a badge is the first step in participating in your project. It was a project. It was voluntary, the way I read it. That was the first step in doing that.

Q. Is the answer to my question, it would not have been sinful for you to have your picture put on the ID badge as long as it's not - -

A. It was very clear to me it was not going to stop there.

Q. I understand that. You've said that a few times.

    What I'm asking is, would it have been sinful, in your view, to have had the school district - - to have allowed the school district to put your photograph on the a photo ID badge if nothing further had been required of you?

A. If I was allowed to have my photograph put on an ID badge and put it in my pocket, that would have been acceptable to me, okay.

(Tr. at 78-79.) Thus, Mr. Sidelinger appeared to fairly clearly testify that he did not have a

religious objection to having his photograph taken for the ID badge. However, in his next

answer he reverted to his original position:

Q. . . . . Did you explain that to anybody during that week, any administrator at the Harbor Creek School District, that I don't have a problem with a photo, whether it has a photo or not, I have a problem with the badge; did you ever say that?

A. I did not differentiate between the photo and the badge. To me, it was all related to wearing a badge.

(Tr. at 79.)

Mr. Sidelinger of course did have his photograph taken, specifically the photograph

that he posted on two internet dating websites. The School District has presented undisputed

evidence that Mr. Sidelinger posted his photograph and detailed profiles on two Internet

dating websites for the purpose of seeking to meet a woman. Mr. Sidelinger's testimony on

these issues was not credible. We find that this conduct is inconsistent with and contrary to

his professed religious belief, insofar as we understand it, against the sins of pride, hypocrisy,

and adornment.

41

Mr. Sidelinger's testimony on the apparent contradiction between his voluntary posting of a photograph of himself on an internet dating site and his refusal to be photographed and to wear the identification badge was evasive at best and self-serving at worst. He admitted that he had sinned, however when pressed he appeared to testify only that his adultery was a sin, but that the other conduct leading up to the sin was merely *wrong*. The other conduct - - having the photograph taken, publicly posting the photograph, posting his profile in order to seek women, and meeting another woman through the website - - were wrong according to Mr. Sidelinger in the sense that they were actions that started him down the road to committing the single sin of adultery.

His testimony was less than clear as to whether he believed publicly posting his photograph and profile on the Internet contradicts his religious belief in avoiding the sins of pride and hypocrisy. When first asked if he had engaged in adultery he said,

> There is no question that I have sinned. I am not perfect. I have confessed that to God and I have confessed it to man. Yes, I have sinned.

(Tr. at 100.) The Court then asked about this issue, with Defense Counsel asking a follow-up question:

> [The Court]: Is this not personal adornment when you have your picture on the Internet, on the world's largest online dating personal service?
> A. Your Honor, I thought I made it quite clear, I have sinned when I did that. Okay? That was a mortal sin by the Catholic Church. Okay? There was a number of things going on in my life. I have sinned there. That was a big mistake on my part, Your Honor.
>   I don't look at this as personal adornment. That was all a big sin.
>   . . .
> [Defense Counsel]: Just to clarify, were you saying when you put the ads on the Internet that was sinful?
> A. The whole experience was sinful.
> Q. Inclusive of merely putting your photo on the Internet?

42

A. Placing my photo - - the whole experience, okay, that led me to the other sin, and you're supposed to avoid things that head you into sin. The whole thing was wrong.

(Tr. at 134-135.)

The reason why Mr. Sidelinger testified in this manner is clear to us. Once Mr. Sidelinger knew that the defense discovered that he had posted his photograph on the Internet dating websites he understood that he had a problem. He could not deny what he did, so his testimony was carefully tailored to allow him the flexibility to move away from a position of having a religious objection to the photograph that was to be included on the identification badge. In other words, he wants to claim that he does not have a religious belief that prohibits him from having his photograph taken, or from displaying his photograph. Thus, his testimony was geared towards explaining away his adultery as the only *sin* contrary to his religious belief. At the same time, he carefully avoided directly testifying that by posting his photograph on the internet he was acting contrary to his religious belief to avoid the sins of pride and hypocrisy.

The question that arises from his testimony is why was Mr. Sidelinger refusing to state his position one way or another, either in regards to the photograph for the badge or the photograph for the Internet dating service? We believe that Mr. Sidelinger provided willfully less-than-specific testimony on this point as it was the only way to leave open the possibility that a fact-finder *could* conclude that posting his photograph on the Internet was not contrary to his stated religious belief.

Had Mr. Sidelinger straightforwardly testified that posting on the internet dating site as he did was contrary to his religious belief he would have seriously weakened his stated

43

position that he sincerely held his religious belief. As the School District argued, how sincere is his belief if he so easily ignored it when it came to publicly posting a photograph of himself on an internet dating website accompanied by a profile describing his interests, his income, and many other personal details? In addition, had Mr. Sidelinger taken this position in his testimony, he would necessarily have had to argue that although he went against his religious belief by posting on the internet dating site, it was a transgression not reflective of the sincerity of his belief.

On the other hand, had Mr. Sidelinger explicitly testified that posting on the internet dating site as he did was *not* contrary to his religious belief he would have had to explain why this was so, at least if he wanted the Court to understand his position. The tepid explanations he did offer were unconvincing, and as noted, meant to obfuscate his belief rather than illuminate it.

In sum, we conclude that publicly posting a photograph of himself on an internet dating website accompanied by a detailed profile is contrary to Mr. Sidelinger's religious belief and undermines his claim that he sincerely holds the belief. In addition, the fact that his photograph and profile remained active within one month of his trial contributes to our finding that he does not sincerely hold a religious belief prohibiting him from wearing an ID Badge.

### 2. Conclusion

The fact that Mr. Sidelinger never wavered in his objection to wearing the ID Badge and that he was willing to risk his job rather than wear the ID Badge are factors that weigh in favor of Mr. Sidelinger's sincerity. However, his decision to preclude inquiry by failing to

44

provide sufficient information about his religious belief and refusing "to indicate at what points that [belief] intersects the requirements of his job" leads us to conclude that Mr. Sidelinger was asserting "an unqualified right to disobey orders that he deem[ed] inconsistent with his [belief] . . . ." Reed, 330 F.3d at 935. Mr. Sidelinger's written communications to the School District, his trial testimony, and his "deposition testimony . . . make[] it clear that he was quite unwilling to enter into a dialogue with his employer on [the matter of his religious belief]." Reed, 330 F.3d at 937 (Ripple, J. concurring in part).

In light of Mr. Sidelinger's refusal to provide sufficient information in response to the School District's requests, along with his lack of credibility at trial, we find that Mr. Sidelinger has failed to establish the first element of his prima facie case, that he held a sincere religious belief; and that he has failed to establish the second element of his prima facie case, that he notify the School District of his religious belief.

### C. Mr. Sidelinger Cannot Show That He Was Adversely Affected

Mr. Sidelinger also failed to show that he was adversely affected for failing to comply with the requirement that he wear the Badge because he failed to introduce any evidence to rebut the School District's claim that Mr. Sidelinger would have been fired anyway for reasons independent from his religious belief. Specifically, the School District fired Mr. Sidelinger for three independent reasons: (1) refusal to wear the Badge, (2) failure to abide by the District's practice to call in to report his absences, and (3) refusal to provide information, including his grade book, to allow the District to properly evaluate his students and grade them in his absence. (Def. Ex. 26, Findings of Fact and Conclusions of Law of the Board of Directors of the Harbor Creek School District.)

45

Although Mr. Sidelinger offered evidence to show that there was no policy requiring teachers to phone in absences on a daily basis, that teachers' grade books were their personal property, and that he had provided sufficient information to permit the School District to grade the students, none of this evidence was before the School Board when it made its decision to terminate Mr. Sidelinger. (Tr. at 124.) Mr. Sidelinger thus cannot show that the School Board was motivated by any pretextual reasons when it fired him for failing to call in his absences or for refusing to cooperate with the School District in determining his student's grades.

## IV. Conclusion

Mr. Sidelinger has failed to set forth a prima facie case of religious discrimination in that he has failed to establish that he had a sincerely held religious belief and that he has failed to provide sufficient notice to the School District of his religious belief. In addition, Mr. Sidelinger has failed to show that he would not have been fired anyway for reasons independent from his religious belief. Accordingly, we will enter Judgment as a matter of law in favor of Defendant.

An appropriate Order will be entered.

November 27, 2006
Date

Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.
Senior United States District Judge

46